UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>ROBERT J. SAMPSON, )<br>)<br>       Defendant. )<br>) | CRIMINAL NO. 4:04CR40010-NMG<br><br>VIOLATIONS:<br><br>15 U.S.C. §§ 80b-6 & 80b-17 (Willful Violation of Section 206 of the Investment Advisers Act)<br><br>15 U.S.C. §§ 78j & 78ff (Willful Violation of Section 10(b) of the Securities Exchange Act of 1934)<br><br>18 U.S.C. § 1341 (Mail Fraud)<br><br>18 U.S.C. § 981 (Forfeiture) |

## INFORMATION

The United States Attorney Charges:

1. At all times material to this Information, Robert J. Sampson ("SAMPSON") lived at 38 Siani Road, Rochdale, Massachusetts.

2. At all times material to this Information, SAMPSON was a financial advisor. SAMPSON was licensed to sell stocks, bonds, mutual funds, insurance and variable annuities. He held NASD Series 6 (mutual fund and insurance contracts) and Series 7 (general securities representative) registrations. He also held Massachusetts state registrations to sell insurance and securities.

3. From April 1992 to November 1998, SAMPSON was employed by Salisbury Investments ("Salisbury Investments") in Worcester, Massachusetts. SAMPSON acted as an investment adviser and financial planner at Salisbury Investments.

4. On or about November 20, 1998, Wheat First Union Securities, a division of Wheat First Securities, Inc. ("First Union"), acquired Salisbury Investments. At that time, SAMPSON became an employee of First Union as a financial planner and investment adviser.

5. At both Salisbury Investments and First Union, SAMPSON was in the business of providing investment advice to clients. Among other things, SAMPSON provided financial planning advice, made investment recommendations, and bought and sold securities on behalf of his clients.

6. On or about November 22, 2000, First Union terminated SAMPSON as an employee.

## THE SCHEME TO DEFRAUD

7. From at least 1995 through approximately October 2000, SAMPSON defrauded his clients of in excess of $200,000. Although SAMPSON's specific fraudulent acts varied from client to client, SAMPSON's basic scheme was to persuade his clients that the best way to invest was to deliver funds for investment via checks made payable to SAMPSON personally. SAMPSON promised his clients that after he received the funds, he would then invest the funds for their benefit. Upon receiving the investment checks from his clients, however, SAMPSON would then deposit them into his personal bank account and spend the funds for his own personal purposes.

### John and Bridgette Fleming

8. Sometime in 1996, John and Bridgette Fleming (the "Flemings"), a retired couple from Worcester, Massachusetts, became clients of SAMPSON. At that time, the Flemings had various investments with other firms. The Flemings opened a brokerage account with SAMPSON at Salisbury Investments and began transferring their investments to that account.

9. In or about October 1996, John Fleming purchased, through SAMPSON, a variable annuity policy of approximately $17,000 with Allmerica Financial Life Insurance and Annuity Company ("Allmerica"). The policy number was AN402071. In or about November 1996, the Flemings purchased, through SAMPSON, two additional variable annuities with Allmerica, one for approximately $13,000 and one for approximately $22,000. The policy numbers of those variable annuities were AN402849 and AN402850, respectively. The Flemings purchased each of the three policies by exchanging policies they held with MFS/Sun Life of Canada and Equitable Life Insurance of Iowa. These annuities were held in the brokerage account the Flemings had opened with SAMPSON.

10. At first, the Flemings' brokerage account with SAMPSON was held through Robert Thomas Securities, which was the broker/dealer then affiliated with Salisbury Investments. In November 1998, however, Salisbury Investments was acquired by First Union and the Flemings' brokerage account was held through First Union in Account No. WV05 3251-8773 (the "Fleming Brokerage Account"). The Fleming Brokerage Account held stocks, cash and the Allmerica annuities.

11. Beginning at least in July 1998, SAMPSON began redeeming funds from the Allmerica annuities. More specifically, SAMPSON ordered the following redemptions from the Allmerica annuities:

| ALLMERICA ANNUITY REDEMPTIONS | | |
|---|---|---|
| Date | Amount | Annuity # |
| 7/6/98 | $4,000.00 | AN402071 |
| 7/6/98 | $2,500.00 | AN402049 |

| ALLMERICA ANNUITY REDEMPTIONS | | |
|---|---|---|
| 7/6/98 | $2,500.00 | AN402850 |
| 11/30/98 | $3,000.00 | AN402071 |
| 11/30/98 | $2,000.00 | AN402071 |
| 11/30/98 | $1,200.00 | AN402049 |
| 3/23/99 | $1,400.00 | AN402049 |
| 3/23/99 | $2,000.00 | AN402050 |
| 3/23/99 | $1,600.00 | AN402071 |
| 8/27/99 | $3,500.00 | AN402071 |
| 8/27/99 | $2,500.00 | AN402049 |
| 8/27/99 | $5,000.00 | AN402050 |
| 11/17/99 | $1,500.00 | AN402071 |
| 11/17/99 | $3,500.00 | AN402050 |

12. SAMPSON also liquidated shares of common stock held in the Fleming Brokerage Account, including those set forth in the following table:

| LIQUIDATION OF COMMON STOCK IN FLEMING BROKERAGE ACCOUNT | | |
|---|---|---|
| Date | Security | Proceeds |
| 10/6/99<br>10/7/99 | Compaq Computer Corp.<br>Compaq Computer Corp. | $277.73<br>2,889.83 |
| 11/19/99 | Egghead.com, Inc. | $1,651.34 |

13. Following the various redemptions of the Allmerica annuities and the sales of stock, SAMPSON would tell the Flemings that the checks representing the proceeds of those redemptions and sales were "interest checks" from their investments. SAMPSON also told the Flemings that they ought to reinvest the "interest checks." SAMPSON told them that the best

4

way to reinvest the "interest checks" was for the Flemings to deposit them into the Flemings' personal checking account and then write checks from their personal account payable to SAMPSON personally. SAMPSON said that, upon receiving the funds, he would then reinvest them for the Flemings's benefit.

14. The Flemings did as SAMPSON had requested. They deposited the checks from the Allmerica annuity redemptions and the stock sales and wrote a series of checks made payable to SAMPSON personally. The following table sets forth certain of those checks:

| THE FLEMINGS' CHECKS TO SAMPSON ||||
|---|---|---|---|
| Check | Date | Payee | Amount |
| 1107 | 7/21/98 | Robert Sampson | $9,000.00 |
| 1175 | 12/10/98 | Robert Sampson | $7,208.00 |
| 1246 | 4/8/99 | Robert Sampson | $1,500.00 |
| 1315 | 9/2/99 | Robert Sampson | $4,000.00 |
| 1323 | 9/99 | Robert Sampson | $7,000.00 |
| 1344 | 10/19/99 | Robert Sampson | $3,500.00 |
| 1365 | 11/22/99 | Robert Sampson | $2,500.00 |
| 1368 | 12/2/99 | Robert Sampson | $4,000.00 |

15. Contrary to his representations, however, SAMPSON did not "reinvest" for the Flemings the funds they delivered via personal check payable to SAMPSON. Instead, SAMPSON deposited the checks into his personal bank account at Commerce Bank & Trust Co. ("Commerce") in Worcester, Massachusetts, commingled the funds with his own personal funds, and used the funds for his own personal purposes.

### Norma Girouard

16. Sometime in 1995, Norma Girouard ("Girouard") of Millbury, Massachusetts, became SAMPSON's client. Girouard was in her mid-50's and had been recommended to SAMPSON by a friend.

17. In or about August 1998, SAMPSON spoke with Girouard and told her that he was setting up, on her behalf, what SAMPSON called a "house account." SAMPSON told Girouard that a "house account" was similar to an escrow account in which SAMPSON would hold Girouard's money on hand to invest where and when it was best to do so. SAMPSON told Girouard to make out her checks to SAMPSON personally.

18. Girouard did as SAMPSON requested and wrote checks to SAMPSON personally.

19. Girouard wrote approximately $16,000 of checks payable to SAMPSON that SAMPSON deposited into his own personal account. These included checks explicitly earmarked for a "house account" as well as others simply written to SAMPSON personally:

| GIROUARD'S CHECKS TO SAMPSON ||||
|---|---|---|---|
| Check No. | Date | Payee | Amount |
| 2164 | 8/3/98 | Robert Sampson | $1,000.00 |
| 2198 | 9/14/98 | Robert Sampson | $490.00 |
| 2208 | 9/22/98 | Robert Sampson | $500.00 |
| 2209 | 9/24/98 | Robert Sampson | $3,000.00 |
| 2245 | 12/7/98 | Robert Sampson | $2,500.00 |
| 2327 | 6/18/99 | Robert Sampson | $2,000.00 |
| 2343 | 7/26/99 | Robert Sampson | $2,500.00 |
| 2358 | 8/20/99 | Robert Sampson | $2,500.00 |
| 2417 | 12/28/99 | Robert Sampson | $1,500.00 |

20. Girouard eventually noticed that there was no evidence in her monthly statements that any of the money she had delivered to SAMPSON had been credited to her First Union account.

21. SAMPSON had, in fact, deposited the checks from Girouard into his account at Commerce; he did not invest for Girouard the funds she sent to him. Instead, SAMPSON commingled the funds with his personal funds and used the funds to pay his own personal expenses.

### Roland (Sr.) and Theresa Tremblay

22. Roland (Sr.) and Theresa Tremblay (collectively the "Senior Tremblays") became clients of SAMPSON during the 1980s when they were investing for their retirement. When they became clients of SAMPSON, the Senior Tremblays lived in Fiskdale, Massachusetts. The Senior Tremblays would periodically send investment checks to SAMPSON.

23. At some point in time, no later than June 1995, SAMPSON requested the Senior Tremblays to make investment checks payable to him personally. SAMPSON represented to them that by doing so he would have more flexibility to place their money into good investment opportunities.

24. In or about 1996, the Senior Tremblays relocated to Sebring, Florida. While in Florida, the Senior Tremblays remained clients of SAMPSON. They continued to send checks to SAMPSON for investment. On most occasions, the Senior Tremblays sent checks from their personal checking accounts that were made payable to SAMPSON personally. On other occasions, the Senior Tremblays endorsed cashiers' checks or sent money orders. The Senior Tremblays usually mailed the checks to SAMPSON from Florida.

25. The checks the Senior Tremblays sent to SAMPSON included the following:

| THE SENIOR TREMBLAYS' CHECKS TO SAMPSON | | | |
|---|---|---|---|
| Check | Date | Payee | Amount |
| 466 | 6/15/95 | Robert Sampson | $1,595.00 |
| 481 | 7/28/95 | Robert Sampson | $417.20 |
| 469 | 7/10/96 | Robert Sampson | $1,600.00 |
| 474 | 8/9/96 | Robert Sampson | $1,700.00 |
| 475 | 8/9/96 | Robert Sampson | $5,000.00 |
| 173 | 9/3/96 | Robert Sampson | $2,000.00 |
| 174 | 9/3/96 | Robert Sampson | $2,700.00 |
| 480 | 10/7/96 | Roland and Theresa Tremblay (Cashier's Check) | $6,000.00 |
| 483 | 12/29/97 | Roland and Theresa Tremblay (Cashier's Check) | $5,000.00 |
| 175 | 4/4/98 | Robert Sampson | $2,000.00 |
| 176 | 4/4/98 | Robert Sampson | $6,000.00 |
| 344 | 1/20/00 | Robert Sampson (Money Order) | $1,000.00 |
| 327 | 3/17/00 | Robert Sampson | $2,000.00 |
| 328 | 3/24/00 | Robert Sampson | $8,000.00 |

26. Contrary to SAMPSON's representations to the Senior Tremblays that he would invest the funds for their benefit, SAMPSON deposited the checks into his personal account and used the funds for his personal purposes.

### Roland (Jr.) and Theresa Tremblay

27. Roland (Jr.) and Lisa Tremblay (collectively the "Junior Tremblays") of Fiskdale, Massachusetts, became clients of SAMPSON sometime during 1995.

28. In or about March 2000, the Junior Tremblay's received proceeds of an insurance settlement. SAMPSON opened two accounts for them. One was opened in Roland, Jr.'s and

8

Lisa's names (approximately $120,000.00) (Account No. 8375-1302); the other was a trust account for the benefit of the Junior Tremblays' daughter Jennifer (approximately $488,000.00) (Account No. 8378-8824).

29. In or about September 2000, SAMPSON called the Junior Tremblays on the telephone and informed them that their accounts were making money and that "there was more money around," or words to that effect. SAMPSON invited the Junior Tremblays to his office at First Union and he told them to bring their checkbook.

30. Roland, Jr. went to SAMPSON's office and met with SAMPSON. During that meeting, SAMPSON provided at least one purported interest or dividend check to Roland, Jr. drawn on the Junior Tremblays' accounts at First Union.

31. The check was for $20,000. It was issued by First Union on September 15, 2000 for Account No. 8378-8824 and drawn on a First Union National Bank account at P.O. Box 4284, Glen Allen, Virginia 23058-4284.

32. Around that same time, on September 13, 2000, SAMPSON also ordered a cash disbursement from Account No. 8375-1302 of $12,000. Most of this $12,000 represented the proceeds of a redemption SAMPSON had made of shares in a mutual fund held in that same account.

33. SAMPSON requested that the Junior Tremblays deposit the checks into their personal accounts and write one personal check payable to Salisbury Investments. On or about September 20, 2000, the Junior Tremblays wrote a check to Salisbury Investments for $27,000 drawn on their personal checking account at Southbridge Savings Bank (Account No. 880154778).

34. SAMPSON deposited the $27,000 check into his own personal bank account, and did not reinvest the funds for the Junior Tremblays. Instead, SAMPSON commingled the funds with his personal funds and used the funds for his personal expenses.

### Vivian Nelson

35. Vivian Nelson ("Nelson") of Worcester, Massachusetts was a client of SAMPSON during 1999. Nelson, who is elderly, relied on her son David to assist her with financial matters.

36. On at least two occasions in 1999, during periodic reviews of Nelson's accounts, SAMPSON solicited additional investment funds. He requested that the investment checks be made out to him personally. Nelson, with the concurrence of her son, complied with SAMPSON's request.

37. Nelson made out two checks to SAMPSON personally: (1) a $10,000 check written in or about October 13, 1999 and (2) a $9,500 check written in or about December 12, 1999.

38. SAMPSON deposited the checks into his personal account at Commerce and, contrary to his representations to Nelson, he commingled the funds with his personal funds and used the funds for his personal expenses.

### Zena Uzep

39. Zena Uzep ("Uzep") of North Grafton, Massachusetts became a client of SAMPSON during the 1980's.

40. Uzep hired SAMPSON to help her formulate investment goals and to come up with an investment strategy. She paid him between $100 and $200 for that service.

41. Uzep then placed approximately $10,000 with SAMPSON. Uzep then began a regular practice of once a week sending to SAMPSON checks for $25.00.

42. Periodically, Uzep would meet with SAMPSON to review her investments. On those occasions Uzep would request an accounting of her funds and what she had invested. SAMPSON was evasive in his answers. On those occasions, SAMPSON would also request that Uzep invest more money. When she agreed to do so, SAMPSON instructed Uzep to make the investment checks payable to SAMPSON personally. SAMPSON told Uzep that he would direct the funds into investments for her behalf.

43. The checks written to SAMPSON that he deposited in his bank account at Commerce Bank in Worcester included the following:

| ZENA UZEP CHECKS TO SAMPSON | | | |
|---|---|---|---|
| Check | Date | Payee | Amount |
| 1046 | 12/6/97 | Robert Sampson | $1,500.00 |
| 1185 | 6/26/98 | Robert Sampson | $1,400.00 |
| 1433 | 7/12/99 | Robert Sampson | $1,500.00 |

44. SAMPSON did not invest the funds from Uzep for her benefit. Instead, he deposited the checks into his personal bank account, commingled the funds with his own personal funds, and used the funds for his personal expenses.

### Dennis Katz

45. In or about June 1998, Dennis Katz ("Katz") of Upton, Massachusetts, became a client of SAMPSON.

46. In June 2000, Katz informed SAMPSON that he intended to invest $120,000 into his First Union account. SAMPSON told Katz that he should provide the $120,000 in two $60,000 checks, one written to First Union and one written to Salisbury Investments.

47. Following SAMPSON's direction, Katz purchased two cashier's checks from Commerce, each one for $60,000, one written to First Union and one written to Salisbury Investments.

48. SAMPSON deposited the $60,000 check to Salisbury Investments into his personal account. SAMPSON used the funds for his personal expenses.

49. In or about October 2000, Katz noticed that the $60,000 funds from the check to Salisbury Investments had not been forwarded into his First Union account. Katz notified management at the First Union Worcester branch.

50. Jeffrey Mazza, the branch manager ("Mazza"), and Kenneth Wood, the assistant branch manager ("Wood"), spoke to SAMPSON about Katz's inquiry. On or about October 19, 2000, SAMPSON admitted to Mazza and Wood that he had deposited the $60,000 check written to Salisbury Investments into his personal account and used it for personal expenses that were in arrears. SAMPSON then signed a statement confirming this admission.

51. On or about November 22, 2000, First Union terminated Sampson.

## COUNT ONE
### Willful Violation Of The Investment Adviser's Act of 1940
### 15 U.S.C. §§ 80b-6 & 80b-17

52. The United States Attorney realleges and incorporates by reference the allegations in paragraphs 1-54 of this Information and further charges:

53. At all times pertinent to the Information, SAMPSON was an "investment adviser" within the meaning of Section 202(a)(11) of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-2(a)(11).

54. On various dates from 1995 through October 2000, the exact dates being unknown to the United States Attorney, at Worcester in the District of Massachusetts and elsewhere,

ROBERT J. SAMPSON,

defendant herein, being an investment adviser did, by use of the mails and by use of means and instrumentalities of interstate commerce, willfully employ devices, schemes, and artifices to defraud; did willfully engage in transactions, practices, and courses of business which operated as a fraud or deceit upon clients and prospective clients; and did willfully engage in acts, practices, and courses of business which were fraudulent, deceptive, and manipulative, to wit, falsely representing that he would serve as an investment adviser exercising fiduciary responsibility with respect to client funds entrusted to him and thereafter misapplying and misappropriating client funds. All in violation of 15 U.S.C. §§ 80b-6 & 80b-17.

## COUNTS TWO THROUGH FOUR
**Willful Violations Of The Securities Exchange Act of 1934**
**15 U.S.C. §§ 10(b) and 32(a)**

55. The United States Attorney realleges and incorporates by reference the allegations in paragraphs 1-54 of this Information and further charges:

56. At various date at Worcester in the District of Massachusetts and elsewhere,

**ROBERT J. SAMPSON,**

defendant herein, did knowingly and willfully, by the use of means and instrumentalities of interstate commerce or of the mails or of a facility of a national securities exchange, directly and indirectly use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of a security in contravention of Rule 10b-5 (17 C.F.R. Section 240.10b-5) of the Rules and Regulations promulgated by the United States Securities and Exchange Commission, and did (a) employ a device, scheme and artifice to defraud, (b) make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in light of circumstances under which they were made, not misleading and (c) engage in acts, practices and a course of business which would and did operate as a fraud and deceit, in connection with the following shares of securities, to wit, by ordering the sales of securities held in client accounts as part of his scheme to defraud his clients, including:

| | |
|---|---|
| COUNT TWO | Execution of "Solicited" sale of 15 shares of Compaq Computer Corp. on 10/6/99 by "First Union Securities" for account of "John J. Fleming & Bridgette E. Fleming, JT. Ten, 15 Knowles Road, Worcester, MA 01602." |

| | |
|---|---|
| COUNT THREE | Execution of "Solicited" sale of 135 shares of Compaq Computer Corp. on 10/7/99 by "First Union Securities" for account of "John J. Fleming & Bridgette E. Fleming, JT. Ten, 15 Knowles Road, Worcester, MA 01602." |
| COUNT FOUR | Execution of "Solicited" sale of 125 shares of Egghead.com, Inc. on 11/19/99 by "First Union Securities" for account of "John J. Fleming & Bridgette E. Fleming, JT. Ten, 15 Knowles Road, Worcester, MA 01602." |

All in violation of 15 U.S.C. §§ 78j(b) and 78ff(a) and 17 C.F.R. §240.10b-5.

## COUNTS FIVE THROUGH EIGHT
## Mail Fraud
## 18 U.S.C. § 1341

57. The United States Attorney realleges and incorporates by reference the allegations in paragraphs 1-54 of this Information and further charges:

58. On or about the dates set forth below, in the District of Massachusetts and elsewhere,

ROBERT J. SAMPSON,

having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, for the purpose of executing and attempting to do so, did take and receive matters and things sent and delivered by the United States Postal Service, and knowingly caused to be delivered by the United States Postal Service mail such matters and things, as follows:

| | |
|---|---|
| COUNT FIVE | Check No. 475-00722 for $3,500 dated October 8, 1999 written by "Wheat First Union" at "Post Office Box 4284 Glen Allen, Virginia 23058-4284" to "John J. Fleming and Bridget L. Fleming, 35 Knowles Road, Worcester, MA 01602-3261." |
| COUNT SIX | Check No. 327 for $2,000 dated March 17, 2000 payable to "Robert J. Sampson" from "Roland W. Tremblay" drawn on "NationsBank" account of "Roland Tremblay or Theresa R. Tremblay, 1407 Abbey Lane, Sebring FL 33870" with note "for Invst." |
| COUNT SEVEN | Check No. 328 for $8,000 dated March 24, 2000 payable to "Robert J. Sampson" from "Roland + Theresa Tremblay" drawn on "NationsBank" account of "Roland Tremblay or Theresa R. Tremblay, 1407 Abbey Lane, Sebring FL 33870" with note "for Investment." |

COUNT EIGHT          Check No. 475-01518 for $20,000 dated September 15, 2000 written by "Wheat First Union" at "Post Office Box 4284 Glen Allen, Virginia 23058-4284" to "Jennifer Tremblay Trust, 40 Arnold Road, Fiskdale, MA 01518."

All in violation of 18 U.S.C. § 1341.

## **FORFEITURE ALLEGATION**
**(18 U.S.C. § 981 & 28 U.S.C. § 2461)**

Pursuant to 18 U.S.C. § 981 & 28 U.S.C. § 2461(c), as a result of committing one or more of the offenses set forth in Count Eight of this Information, ROBERT J. SAMPSON, defendant herein, shall forfeit to the United States any property constituting, or derived from, proceeds he obtained, directly or indirectly, as a result of his violations of 18 U.S.C. § 1341, up to the sum of $20,000.


MICHAEL J. SULLIVAN

UNITED STATES ATTORNEY

_____
Jack W. Pirozzolo
Assistant United States Attorney
DISTRICT OF MASSACHUSETTS April 20, 2004