JOSEPH GRIMALDI, PH. D.
MOBILE: 508-410-5911
E-MAIL: PARGHELIA@YAHOO.COM

# PSYCHOLOGICAL EVALUATION

ROBERT J. SAMPSON

# Diagnostic, Treatment Review
## AND PSYCHOLOGICAL FORMULATION FOR ROBERT J. SAMPSON

### REASON FOR REFERRAL

MR. SAMPSON WAS REFERRED TO ME BY DR. JEFFREY SCHERZ, of Prescott Health Care, for psychological evaluation and treatment. At the time of the referral I was a staff psychologist at Prescott Health Care. Dr. Scherz had been seeing Mrs. Sampson in therapy with Mr. Sampson occasionally joining the sessions, and because of a potential conflict he referred Mr. Sampson to me for individual therapy. Individual therapy was deemed necessary because of Mr. Sampson's ongoing symptoms of depression, guilt, worry and anxiety. At the time of Mr. Sampson's initial referral to me, Mr. Sampson was in the middle of dealing with very serious legal difficulties, due to allegations of misuse of client's funds.

### HISTORY OF PRESENT ILLNESS

MR. SAMPSON'S LEGAL DIFFICULTIES BECOME PUBLIC IN JANUARY OF 2001, when a news story broke in the Boston and Worcester newspapers. The newspaper stories used dramatic language alleging embezzlement and misuse of client funds. Before he resigned Mr. Sampson was a financial consultant First Union Securities. The news articles implied that Mr. Sampson performed these misdeeds for his own financial gain. In fact, Mr. Sampson resigned his position, voluntarily relinquished his various financial trading licenses and was making preparations to replace the missing funds.

Mr. Sampson did not discuss his work difficulties with his family, so when these difficulties came to light his family members were all devastated. His marriage, which had been very sound, was now in jeopardy. It was this marital crisis that triggered Mrs. Sampson referral to Dr. Scherz.

When Mr. Sampson saw his family physician in February of 2001, he was, to use his own words, "a basket case". His depression and anxiety were so evident to his physician, that he placed Mr. Sampson on Zoloft immediately. As I mentioned above, Mrs. Sampson was so devastated that she sought out psychotherapy for herself. Mr. Sampson's youngest son developed a serious alcohol abuse problem.

The events that led up to Mr. Sampson's legal problems began about 15 years ago. Apparently two clients that he had been working with had a severe change in personal financial circumstances. It seemed to him at the time that left to their devices; these two clients would rapidly take a severe downward turn and perhaps even wind up homeless. In an attempt to prevent, what to him would have been a tragedy, he began to supplement their income by using his own funds. Eventually using his own funds was not sufficient and he began to use funds from other client's accounts. His intent was to do this temporarily until he could figure out other ways to help his very needy client's. However, before he could put a plan into place his financial misdeeds came to the attention of regulators, and then became public in the newspapers. Ironically, especially since Mr. Sampson used up so much of his own money, the newspaper story implied that Mr. Sampson did this for his own gain! In fact, Mr. Sampson was trying to support two families besides his own. This would be a daunting task even if Mr. Sampson's financial circumstances were sufficient in and of themselves. Unfortunately, his personal income

was not sufficient to handle a set of circumstances that gradually overtook and overwhelmed him.

One of the clients that he tried to help had serious psychological problems, including, but probably not limited to, bipolar disorder. This client was apparently treatment resistant, and was not compliant with her medications. All attempts by Mr. Sampson to get psychological help were sabotaged by the client. Mr. Sampson even went so far as to set up an appointment himself, but the client did not follow through. Consequently there were many emergency phone calls, frequently due to furtive suicide attempts and trips to the emergency room. Apparently, these emergencies became so frequent and occurred and such late hours, that Mrs. Sampson thought that Mr. Sampson was having an affair!

## PAST HISTORY

MR. SAMPSON WAS BORN IN MASSACHUSETTS ON APRIL 24, 1951. His early education took place in Catholic Schools. He attended both Fitchburg and Mount Wachusetts for college level work and achieved an Associates degree along the way. He described his early childhood in mostly positive terms, stating that his parents treated him well without unduly harsh discipline. He was not forced by his parents to achieve, but the "expectations were always there", just not overtly stated.

In high school Mr. Sampson began to have gastrointestinal symptoms. These GI difficulties eventually were diagnosed as Irritable Bowel Syndrome (IBS). But in 1968, when Mr. Sampson was 18, that was an unknown diagnosis. His complaints did not resolve easily, and his physicians performed exploratory surgery, and wound up removing part of his intestine. Even though we now know that IBS has a strong psychological component, that was not considered then and Mr. Sampson did not receive any counseling. Later on in his life Mr. Sampson began also began to have lower back problems. This disorder is also known to have a strong psychological component. However, Mr. Sampson did receive any counseling until after his legal problems became public. Mr. Sampson did not receive any other kind psychiatric help before his current episode. His family never required counseling, and his marriage never required repair.

Subsequent to Mr. Sampson difficulties becoming public, his family has experienced one tragedy after another. He has detailed these in a letter to the court

## DIAGNOSTICE AND TREATMENT SUMMARY

I BEGAN TO TREAT MR. SAMPSON ON MARCH 25, 2002. I continued to treat him until my departure from Prescott Health Care. We had our last session on November 24, 2003. Presenting symptoms included, depressed mood, feelings of guilt, poor sleep, feelings of anxiety, bodily tension, and strong feelings of worthlessness. Although Mr. Sampson never entertained serious thoughts of suicide because of the horrors it would inflict on his family, he frequently experienced passive death wishes ("I wish I was dead, I wish I was never born, etc."). He was already on Zoloft by the time he came to see me, so some of his symptoms were blunted. Nevertheless, it was pretty clear that he was, in the past, as well as when I saw him, a very depressed man. I gave him a main clinical diagnosis of Major Depressive disorder. Clearly this disorder was triggered by the overwhelming amount of stress he was exposed to, not just recently but for last 15 or so years. The public disclosure was merely the "straw that broke the camel's back". However, the most significant aspect of Mr. Sampson's psychological presentation and make-up is his underlying personality structure.

The initial clinical presentation, viz., his depression, was a reaction to events, and not explanation of them. His personality structure is another matter. The best way to describe Mr. Sampson's personality would be "controlled". His emotions though at times intense, were constricted and limited in range. It was as if he always had to exert force, keeping powerful energies reigned in. Even when he tried to relax in the chair of my office, he gave the impression of a tightly wound spring, ready to release its energy at any moment. It was also clear; this underlying energy would never be allowed to be released, except in the most controlled manner.

A good example of this "control", was Mr. Sampson's emotional presentation, when he would describe the apparently endless that befell his and his wife's family. Each tragic death was followed by another. His house even burned down, resulting in him losing his home, and in a sense became "homeless." Yet despite these terrible life events, Mr. Sampson's emotional expression did not vary. He was a model of controlled behavior, without a display of unruly emotions. It was obvious that Mr. Sampson was feeling quite a lot, but it was all buried.

This emotional control occurs within a context of an overly developed sense of duty and responsibility, and a highly developed moral sense. There is also a constant underlying tension, and in fact his physical problems are bodily representations of this constant underlying tension. Usually individuals with this personality structure, have very little insight into their inner workings and motivations. They are just doing "what they are supposed to", and "just giving back to the community". Work is everything, and in Mr. Sampson's case this also meant charitable ventures. In the letter that he wrote for the court, he listed 13 charitable venture or "giving of his time" activities. Most of us would have been satisfied with one or two to feel giving. Mr. Sampson needed 13, and still did not feel as if he did enough. Please note, that Mr. Sampson's charitable activities were not in his mind any way related to financial misdeeds at his job. He was just doing what he thought was right.

How then do we explain Mr. Sampson's behavior in apparently using money that was not his? Under the circumstances presented to him, he would have been psychologically unable to do anything else. And when it finally became apparent that even his finely tuned sense of duty was being violated, his client's emotional and psychological machinations prevented action. He would have not have been psychologically sophisticated enough, or insightful enough to see a clear or easy way out. He was trapped by his own sense of duty, and extricating himself came to slow and too late.

## CONCLUSION

MR. SAMPSON, IN AN ATTEMPT TO HELP SOME OF HIS CLIENT'S, used money from other of his client's (as well as his own). He was not psychotic at the time he committed these acts. He not only knew right from wrong, he had an overdeveloped and ultimately maladaptive sense of morality, duty and responsibility. That is why he is not seeking to avoid responsibility and readily admits to wrongdoing. But as I have said above, his personality structure was so ingrained, and inflexible, it was psychologically impossible for him to have behaved otherwise. In this situation, if he avoided wrongdoing, he would have committed a greater sin, and would let down others less fortunate than him.

In this particular situation, to punish Mr. Sampson and his family more by putting him in jail would be a travesty of the highest order. He has already tried to make financial restitution to the best of his ability. Not even a sentence of community service makes sense to one who has devoted so much to community service. If the court feels compelled to issue some kind of activity to accompany the probation I am recommending, that it be some kind of outpatient psychotherapy commitment. If

he needs anything at this point in his life it is to understand what forces drove him to make the painful choices that he made.

Mr. Sampson's family deserves to have this devoted man in their lives regularly, and without interruption. He has been absent emotionally too long, and it took this tragic set of circumstances to bring him home. Let's not take him away again.

*Joseph Grimaldi*

Joseph Grimaldi, Ph.D.
Clinical Psychologist