# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO.  04-40010-NMG |
| | ) | |
| ROBERT J. SAMPSON, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM AND OPPOSITION TO DOWNWARD DEPARTURE

The United States submits this memorandum in advance of the January 11, 2005 sentencing of Robert J. Sampson ("Sampson").  On August 17, 2004, Sampson, waived indictment and, pursuant to a plea agreement, pled guilty to an eight count information (the "Information") charging him with one count of investment adviser fraud, in violation of 15 U.S.C. §§ 80b-6 & 80b-17, three counts of securities fraud, in violation of 15 U.S.C. §§ 78j(b) & 78ff(a), and four counts of mail fraud, in violation of 18 U.S.C. § 1341.  Sampson has moved for a downward departure of five levels, to offense level ten, from the offense level applicable under the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") and has requested a sentence of probation.  For the following reasons, the Court should not depart downward from the applicable offense level under the Guidelines.

### I.  Background

The facts related to the offense set forth in the Information are not materially disputed by the parties.  As summarized in the Presentence Report ("PSR"), at all relevant times, Sampson was a financial adviser employed at the Wheat First Union Securities ("First Union") branch in

Worcester, Massachusetts.  From at least 1995 through approximately October 2000, Sampson

defrauded his clients of in excess of $200,000.  Although Sampson's specific fraudulent acts

varied from client to client, Sampson's basic scheme was to persuade his clients that the best

way to invest was to deliver funds for investment via checks made payable to Sampson

personally.  Sampson promised his clients that after he received the funds, he would then invest

the funds for their benefit.  Upon receiving the investment checks from his clients, however,

Sampson would deposit them into his personal bank account and spend the funds for his own

personal purposes.

 As set forth in the PSR (¶ 42), the victims and their losses identified by the United States

include:

| Victim | Loss Amount | Comment |
|---|---|---|
| John & Bridgette Fleming | $38,708 | Funds represented liquidations by Samson of annuities owned by the Flemings. |
| Norma Girouard | $15,990 | Funds represented diversion of moneys Girouard, who was in her mid-50's, had provided to Sampson after he asked her to write checks to a "house account." |
| Roland, Sr. & Theresa Tremblay. | $45,012.20 | Funds represented diversion of retirement savings of elderly couple. |
| Roland, Jr. & Lisa Tremblay | $27,000 | Funds represented diversion of a portion of insurance settlement funds provided for the support the Tremblays' mentally and physically handicapped daughter, Jennifer, who is 12 and has a mental capacity of a 2-4 year old. |
| Vivian Nelson | $19,500 | Funds represented retirement savings of elderly woman. |
| Zena Uzep | $4,400 | Funds represented portion of savings of woman who sent checks of $25 per week to Sampson to save for retirement. |
| Dennis Katz | $60,000 | Funds represented personal savings. |
| **TOTAL** | **$210,610.20** | |

2

## II. Application of Guidelines

As set forth in the PSR (see ¶¶ 48-60) the relevant offense conduct yields the following

guidelines computation under the November 1, 1998 version of the Guidelines:

| | | |
|---|---|---|
| Base Offense Level | 6 | U.S.S.G. § 2F1.1(a) |
| Loss Enhancement | 8 | U.S.S.G. § 2F1.1(b)(1) |
| More than Minimal Planning | 2 | U.S.S.G. § 2F1.1(b)(2) |
| Abuse of Trust | 2 | U.S.S.G. § 3B1.2 |
| Acceptance of Responsibility | -3 | U.S.S.G. § 3E1.1 |
| Total | 15 | |

Sampson is at Criminal History I. (See PSR ¶63). The resulting Guidelines sentencing range is

18 to 24 months. The fine range is $4,000 to $40,000.

## III. Sentencing Recommendation

Pursuant to the terms of the parties' plea agreement, the United States recommends that

the Court impose a sentence at the low end of the applicable guidelines range – i.e.,

imprisonment of 18 months (assuming the recommended range is accepted by the Court).

Consistent with the plea agreement, the United States further recommends a fine of $4,000,

restitution as determined by the Court, forfeiture, a mandatory special assessment of $800, and 3

years supervised release. (See Plea Agreement ¶ 4).

## IV. Sampson's Departure Arguments

By memorandum dated December 17, 2004, Sampson has requested that the Court depart

downward from his guidelines sentencing range on two grounds: (a) family ties and

responsibilities, pursuant to U.S.S.G. § 5H1.6 and (b) a "combination of factors" pursuant to U.S.S.G. § 5K2.0. For the reasons set forth below, the United States opposes a departure on either ground.

### A.      Family Ties and Responsibilities (U.S.S.G. § 5H1.6)

Sampson moves for a departure under U.S.S.G. § 5H1.6, asserting that the financial and emotional impact that incarceration would have on his wife and 17-year old son – whom he states suffer from mental health conditions of their own -- constitute extraordinary circumstances that warrant a departure. Although the United States recognizes that Sampson's imprisonment will likely impose a hardship on Sampson's wife and son, such hardship is not a basis for a departure under controlling First Circuit law.

In United States v. Pereira, 272 F.3d 76 (1st Cir. 2001), the First Circuit made clear that family hardship is, unfortunately, neither atypical nor unusual when a family member is incarcerated. For this reason, such hardships – without more – cannot justify a departure under § 5H1.6. See id. at 80-83. By way of illustration, the First Circuit cited in Pereira to a series of appellate cases in which considerable family hardships – both financial and emotional – had been deemed insufficient to take defendants out of the "heartland." The cases included situations such as: (1) the imprisonment of both the mother and father of a four-year old child, United States v. Carr, 932 F.2d 67 (1st Cir. 1991) (not extraordinary; vacating departure); (2) a defendant with a neurologically impaired nine-year old son and a wife with fragile mental health, United States v. Rybicki, 96 F.3d 754 (4th Cir. 1996) (not extraordinary; vacating departure); (3) a defendant who was a single mother and the sole provider for five children, one of whom had a substantial neurological impairment, United States v. Sweeting, 213 F.3d 95 (3d Cir. 2000) (not

4

extraordinary; no departure); (4) a defendant who supported three children and had a wife with depressive disorder and panic attacks, United States v. Goff, 20 F.3d 918, 921 (8th Cir. 1994) (no departure warranted); and (5) a defendant who was a single mother with three children under the age of four, where incarceration would require placing the children in foster care, United States v. Dyce, 91 F.3d 1462 (D.C. Cir. 1996) (not extraordinary; vacating departure).

As the First Circuit held in Pereira, in view of the significant hardships that courts have deemed to lie within the "heartland," Sampson cannot supportably contend that his situation should for some reason be found so uniquely exceptional as to fall outside that "heartland." Although incarcerating Sampson will undeniably have a financial impact on his family, that is true in virtually every case involving a defendant who is the principal financial support for his or her spouse and children.  See e.g., United States v. Rushby, 936 F.2d 41, 42-43 (1st Cir. 1991) (no departure for defendant who was main breadwinner for wife and two children).  Moreover, the financial information Sampson has submitted shows that until at least March 2004, Sampson's wife was employed and provided approximately half of the household income.  And although she is currently unemployed, Sampson has not shown that his wife suffers from any disability that would prevent her from working.  Also, Sampson's incarceration will not totally deprive his wife and son with a family support structure.  The PSR itself shows that Sampson has two brothers, one of whom lives in West Townsend, Massachusetts. (See PSR ¶¶ 74-75).[1]

With respect to the asserted emotional impact of incarceration, that, too, exists in every case involving a defendant with a spouse and/or dependents.  To the extent that Sampson asserts

---

[1] The PSR also states that Sampson and his wife are parents of another son, Joseph, age 20, who currently attends the University of New Hampshire.  (See PSR ¶ 78).

that the impact here would be heightened by the fact that his wife and son are receiving treatment in connection with their own mental health issues, the United States notes that the list of cases cited in Pereira included several where appellate courts considered – and rejected – § 5H1.6 departure requests made by defendants who claimed that one or more family members suffered from psychological, neurological or other impairments. See e.g., Rybicki, 96 F.3d at 754 (no departure despite neurologically impaired nine-year old son and wife with fragile mental health); Goff, 20 F.3d at 921 (no departure despite wife with depressive disorder and panic attacks and three dependent children); Sweeting, 213 F.3d at 95 (no departure despite child with substantial neurological impairment for whom defendant was sole provider).[2]

The United States does not mean to deny or diminish the impact that imprisonment will have on Sampson's family. Nevertheless, Sampson's circumstances do not rise to a level that can be deemed truly exceptional, particularly when one takes into account the other cases in which arguably greater hardships have been deemed insufficient to warrant departures. Cf. United States v. Bogdan, 284 F.3d 324, 330 (1st Cir. 2002) ("Regrettably, the 'heartland' of cases under the Guidelines encompasses immense and heart-wrenching hardships." (citing Dyce 91 F.3d at 1467-68 (holding that the district court erred when it departed based on the defendant's status as

---

[2]   In this case, the information Sampson has provided (other than his own statements) regarding the mental condition of his wife consists of a handwritten note from a nurse practitioner that states: "Ms. Sampson suffered from severe depression in March 04.  She is on meds + in counseling."  The information Sampson has provided regarding his son consists of a letter from a physician stating that Brian has been "diagnosed with bipolar disorder and is currently on Trileptal and Prozac."  Sampson has not provided a medical opinion showing that their mental conditions are disabling or the extent to which Sampson's incarceration would affect their current conditions.

a single mother with three children under the age of four, one of whom was being breast-fed, and where incarceration would require placing the children in foster care))).

### B.    Combination of Factors (U.S.S.G. § 5K2.0)

Sampson has also stated that the Court should depart downward due to a "combination of factors" pursuant to U.S.S.G. § 5K2.0.  The commentary to U.S.S.G. § 5K2.0 states that while the Commission does not "foreclose the possibility of an extraordinary case that, because of a combination of characteristics or circumstances, differs significantly from the 'heartland' cases covered by the guidelines," such cases "will be extremely rare."  U.S.S.G. 5K2.0, commentary; see also Bogdan, 284 F.3d at 324 (reversing downward departure based on combination of family ties, introspection and appreciation shown for criminality of conduct).  The combination of factors to which Sampson points includes, in addition to his family circumstances: (1) his community involvement, (2) his own mental condition and the stress he was under at the time of the offense "due to his attempts to assist two other families," and (3) his acceptance of responsibility.  These circumstances, even if taken in combination, do not provide an appropriate basis to depart.

First, Sampson's family ties and community involvement are a discouraged basis for departure under the Guidelines.  See U.S.S.G. § 5H1.6 (family and community ties are "not ordinarily relevant"); cf. Bogdan, 284 F.3d at 328 ("Bogdan's role as a father and his effort to make amends with his wife are considerations that clearly fall within the category of family ties and responsibilities, a discouraged factor under the Guidelines.").  And, as was discussed above, Sampson is not faced with an extraordinary family circumstance.

7

Second, Sampson's claim that a departure is warranted because his conduct was the result of stress "due to his attempts to assist two other families" is without merit. In support of this claim, Sampson has submitted a "Psychological Evaluation" from Joseph Grimaldi, Ph.D. ("Grimaldi"). This evaluation is largely irrelevant to any bases for departure and should not be considered.[3] To the extent the Court does consider Grimaldi's report, it is seriously flawed and does not provide a basis for departure.

In that report, Grimaldi states that Sampson's problems "began about 15 years ago" when two (unnamed) clients suffered "a severe change in personal financial circumstances." According to Grimaldi, to prevent a "tragedy" Sampson began to supplement their income by first using his funds and then, eventually, his other clients' funds. According to Grimaldi, Sampson intended this to be a temporary arrangement. Grimaldi characterizes Sampson as having an "overly developed sense of duty and responsibility [] and a highly developed moral sense" and concludes that Sampson's theft of client funds resulted from that "overdeveloped and ultimately maladaptive sense of morality, duty and responsibility." There are a number of problems with this analysis.

To begin with, in arguing that Sampson's conduct was the result of some overly developed sense of "duty" and "morality" to two clients in difficult personal circumstances,

---

[3]    Sampson's mental condition should not be a basis for departure anyway. The Guidelines provide that mental and emotional conditions are not ordinarily relevant in determining whether a sentence should be outside the applicable Guideline range, except as provided in U.S.S.G. § 5K2. See U.S.S.G. § 5H1.3. Although section 5K2.13 provides for a departure based on "Diminished Capacity," that ground is not applicable here. That ground applies to defendants who were suffering from a "significantly reduced mental capacity," which does not apply to Sampson. In any event, Sampson has not sought a departure based on diminished capacity.

Grimaldi makes no mention of the victims' personal circumstances.  Grimaldi's analysis ignores the fact that Sampson not only took money from retirees who were relying on the money for living expenses, but also took money from a brain damaged little girl, money that came from an insurance settlement and was intended to provide support for her for her entire life.  Grimaldi's total disregard of the victims' personal circumstances in assessing Sampson's "moral sense" lends an air of unreality to his assertions.

In addition, Sampson has provided scant record support for his assertion that the funds went to support the two "families."  Grimaldi does not identify the "two families" in his report, nor does he supply facts corroborating his assertions regarding Sampson's support of the clients and the moral duty Sampson supposedly had.  For his part, Sampson has not quantified the amount of financial support provided to the "families."  Sampson (who bears the burden on this issue) has not provided any accounting of funds that he provided to these two clients and, consequently, has not shown that the amounts provided correspond to the in excess of $200,000 the United States has shown were diverted from the other clients.  Failure to provide this information should, by itself, preclude this claim as a basis for departure.

Furthermore, by letter dated December 22, 2004, the United States asked Sampson to provide, among other things, information supplied to Grimaldi, notes Grimaldi had created, and the identity of the clients.  On January 4, 2005, the only information Sampson provided was the identity of the clients referenced -- Sharon Gervais ("Gervais") and Linda Mershon ("Mershon").

No other information was supplied.[4]  The United States is attempting to locate Gervais, but thus far has been unsuccessful.  The United States believes that Mershon is now deceased.

The United States has obtained, however, an Affidavit of Linda Mershon (the "Affidavit") filed in the administrative proceeding brought against Sampson by the Secretary of the Commonwealth's Securities Division.  The Affidavit, which is attached hereto at Tab A, suggests that Mershon and her husband may have lost money as a result of Sampson's own mismanagement (or, indeed, malfeasance).  In that Affidavit, Mershon states that in 1993 she had invested with Sampson proceeds of an insurance settlement that Mershon's husband had received as a result of a fall that left him confined to a wheel chair.  (Affidavit ¶¶2,4).  According to the Affidavit, in 1995 or 1996, Mershon noticed that the balances in the account were declining and inquired of Sampson, who told her that "he was using [the] money in accounts he had with other people, to invest in oil wells off the coast of Brazil, as well as gambling boats and stock in Personal Service Insurance."  (Affidavit ¶6).  The Affidavit also states that Sampson did provide funds for monthly bills.  (Affidavit ¶¶15-18).[5]  It also recounts a conversation Mershon had with Sampson where he told her, *after* the news of his misappropriation of client funds became public, that her money was gone.  (Affidavit ¶¶22-23).  A fair reading of the Affidavit

---

[4]  The United States also asked for a curriculum vitae for Grimaldi, as well as the information related to Sampson's wife's and son's mental condition.  As of January 6, 2005, the curriculum vitae had not been supplied; and no additional information had been supplied related to the wife's and son's mental illness beyond the handwritten note related to Sampson's wife and the doctor's letter related to Sampson's son.

[5]  The United States has seen in Sampson's bank records checks that appear to be written for the benefit of Mershon (and Gervais).

suggests that Sampson's motives in connection with Mershon may have represented something other than "duty" and a "moral sense." It suggests an attempt to conceal from Mershon his misconduct in connection with his use of her funds.

Finally, Sampson's reliance on his acceptance of responsibility as a factor weighing in favor of departure is unavailing. Acceptance of responsibility is already factored into the Guidelines at U.S.S.G. § 3E1.1. <u>See</u> <u>Bogdan</u>, 284 F.3d at 328 (rejecting claim that prompt acceptance and recognition of wrongdoing was appropriate basis for departure under combination of circumstances analysis). And there is nothing in the facts of this case that show the existence of circumstances of such an exceptional degree that a departure is warranted. <u>See</u> <u>id.</u> at 329 ("None of these factors, whether taken individually or in the aggregate, approximates the benchmark of extraordinariness that this Court has set.").

## CONCLUSION

For all of the foregoing reasons, the United States requests that Sampson's motion for a downward departure be denied and that he be sentenced within the applicable Guidelines range. To the extent the Court is inclined to depart, the Court should reject the request for a departure of five levels.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:   /s/ Jack W. Pirozzolo
        Jack W. Pirozzolo
        Assistant U.S. Attorney
        United States Courthouse, Suite 9200
        1 Courthouse Way
        Boston, MA  02210
        (617) 748-3189

Date: January 6, 2005

## CERTIFICATE OF SERVICE

This is to certify that on January 6, 2005, I served the foregoing document, via electronic means and U.S. Mail, upon James Gribouski, Esq., counsel for the defendant, and, by hand, upon Michelle Roberts of the U.S. Probation Office.

/s/ Jack W. Pirozzolo
JACK W. PIROZZOLO
Assistant U.S. Attorney