COMMONWEALTH OF MASSACHUSETTS
OFFICE OF THE SECRETARY OF STATE
SECURITIES DIVISION
ONE ASHUBURTON PLACE
BOSTON, MASSACHUSETTS 02108

IN THE MATTER OF:            )
                             )
ROBERT SAMPSON               )   DOCKET NO.: 2001-1
                             )
RESPONDENT                   )
                             )

Affidavit of Linda Mershon

Linda Mershon hereby deposes and states under the pains and penalties of perjury:

1. I am a Massachusetts resident. My address is 7 Deer Run, Brookefield, Massachusetts.

2. In 1993 my husband was injured in a fall down a flight of stairs. He received a settlement of one hundred and eighty six thousand dollars ($186,600) for his personal injuries. He is confined to a wheel chair.

3. Shortly after the claim settlement our friend Ellen Oleski recommended Robert Sampson ("Sampson") as someone I could trust to establish an investment account.

4. My husband and I established an account with Sampson in 1993. He provided us with paperwork from both Robert Thomas Securities [Raymond James,] and Salisbury Investments Inc.

5. I received monthly statements from Robert Thomas Securities and handwritten statements from Sampson, on Salisbury Investments Inc. letterhead.

6. In 1995 or early 1996, I noticed the amount of money in our account was going down. I contacted Sampson who told me he was using our money in accounts he

had with other people, to invest in oil wells off the coast of Brazil, as well as gambling boats and stock in Personal Service Insurance ("PSI").

7. I was asked by Sampson in 1994 or 1995 to "reinvest" my money in PSI. He gave me fifteen thousand dollars ($15,000), he said it was from our account to invest in PSI. He said it was necessary to do it this way to show I was investing. He had me invest this money into our account.

8. Sampson said the PSI investment would [could approx] payoff five times what I invested and would take about 5 years to show results.

9. The PSI investment never came through and I realized no money as Sampson promised.

10. In 1994, I retired from nursing after becoming ill. Our only income is from the account with Sampson, my husband's Social Security, and an annuity from his settlement. Sampson had always told me I had a life insurance policy that he purchased for me.

11. Sampson assured me that when I reached age 65 I would receive payments totaling up to one hundred thousand dollars, ($100,000), depending on what the market determined, from the life insurance policy he purchased for me from Phoenix Life. Several months ago I contacted Phoenix Life and they informed me that only two payments were made on the policy and it has since lapsed.

12. In 1995, he had my husband cash out one of the insurance policies for five thousand four hundred fifty four dollars ($5,454) with Equitable Life Insurance Company Of Iowa. He said he reinvested it in various stocks.

13. Sometime in 1997, I stopped getting statements from Sampson. When I inquired to Sampson about this, he said since First Union purchased Robert Thomas he took our account and began investing in "private accounts".

14. In 1997 my husband and I went to Hawaii. Before I left I asked Sampson to pay our bills while we were away. When I returned I noticed that my bills were not paid. From this point on when we asked Sampson for money it was very difficult to get any from him.

15. When I asked Sampson for money for our monthly bills he would give me less than the amount I asked for. These requests never exceeded three thousand dollars ($3,000) and were often much less.

16. When he gave me money it was in the form of a check from his personal bank account at Bank Boston or Commerce Bank.

17. On one occasion a check Sampson provided me for my monthly bills bounced.

18. In December of '00 I asked Sampson for $1500 and he provided me with a check for two hundred dollars ($200).

19. I called Jeff Mazza at First Union after I read about Sampson in the paper and asked if the SIPC insurance would cover our apparent losses. He said since the money changed from so many companies the insurance would not cover theft.

20. I called First Union again and asked for Sampson and was told by the female receptionist (who said she recognized my voice), that Sampson was on a leave of absence.

21. I called First Union about four weeks ago and asked for Sampson and was told he no longer worked there. I called him at home and he said he wished to meet with me. From this point on I contacted him at home.

22. The day after the local paper carried the story about Sampson he called me at home. He told me not to believe the story and said it was all a lie. He arranged a meeting at our home the following day.

23. Sampson came to our home and said the money was gone. He explained that various factors resulted in this. He said the investments did not pan out, and that he had given us the rest of the money over the last seven years. He said that maybe he should not have given us some of our money over the years, and added there was not a moment he did not think about what happened.

24. Two weeks ago I spoke with Sampson, and he encouraged us to move to Florida, since we had mentioned the possibility of this when he came to our home.

25. Sharon Gervais is a mutual friend of Sampson and my husband. She resides in ~~Brookefield~~ Worcester, Massachusetts. She is ill and Sampson tends to her pets. I feel she may have invested money with Sampson as well.

Signed under the pains and penalties of perjury this 20th day of March, 2001.

_____
Linda Mershon

_____
Witness

26. "I feel that while we were taking amts for monthly budgets, the amts differ for 800.00 to various amts determined by things like Christmas etc, but the money he was investing for us should have been earning money. The major amt was not just held by him and not growing."